**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PATRICIA L. BELL and**<br>**JACQUELINE D. BURTON**,<br><br>Plaintiffs,<br><br>v.<br><br>**MICHAEL B. DONLEY**,<br><br>Defendant. | Civil Action No. 09-cv-843 (RLW) |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Patricia Bell ("Bell") and Jacqueline Burton ("Burton") (collectively, "Plaintiffs") bring this action against Michael Donley, in his official capacity as Secretary of the Air Force. Plaintiffs are both presently employed in the Air Force's Central Adjudicatory Facility ("AFCAF"), the office responsible for reviewing and processing security clearance applications for employees within the U.S. Department of the Air Force. Through this action, they assert claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, arguing that a number of allegedly adverse actions taken against them—mostly in the form of non-selection for promotions within AFCAF—were retaliatory and/or discriminatory on account of their African-American race. This matter is presently before the Court on the Secretary's Motion to Dismiss in Part and for Summary Judgment (Dkt. No. 59). Upon careful consideration of the parties' briefing and the entire record in this case, the Court concludes, for the reasons set forth herein, that the Secretary's Motion to Dismiss in Part will be **DENIED**, and that his Motion for Summary Judgment will be **GRANTED IN PART** and **DENIED IN PART**. For purposes of this ruling, the Court will assume the reader is familiar with the factual assertions and arguments made by the parties and will not recite those again here.

1

## ANALYSIS

### A. Standard of Review

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). To establish a genuine issue of material fact, the nonmoving party must demonstrate—through affidavits or other competent evidence, FED. R. CIV. P. 56(c)(1)—that the quantum of evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). While the Court views all facts in the light most favorable to the nonmoving party in reaching that determination, *Keyes v. District of Columbia*, 372 F.3d 434, 436 (D.C. Cir. 2004), the nonmoving party must nevertheless provide more than "a scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252. But "[i]f material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Kuo-Yun Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

### B. Legal Standards Governing Title VII Claims

Title VII forbids an employer from discriminating against any individual because of race. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). The statute also prohibits an employer from discriminating and/or retaliating against an employee "'because [s]he has opposed any practice' made unlawful by Title VII or 'has made a charge, testified, assisted, or participated in' a Title VII proceeding." *Steele*, 535 F.3d at 695 (quoting 42 U.S.C. § 2000e-3(a)). Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), both sets of claims are assessed under a familiar, three-step framework. First, the plaintiff must

establish a *prima facie* case.  To make out a *prima facie* case of discrimination, a plaintiff must demonstrate, by a preponderance of the evidence, that:  "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).  For a retaliation claim, a plaintiff's *prima facie* case consists of demonstrating: "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  Next, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the challenged employment action(s). *McDonnell Douglas*, 411 U.S. at 802-04; *Wiley*, 511 F.3d at 155. Finally, the plaintiff "must be afforded the opportunity to prove" that the employer's proffered motive "was not its true reason, but was a pretext for discrimination." *Barnette v. Chertoff*, 453 F.3d 513, 516 (D.C. Cir. 2006) (internal quotations omitted).

However, our Circuit has instructed that, once an employer provides a legitimate, non-discriminatory basis for its decision at the summary judgment stage, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Instead, the central question for the Court to resolve is whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . [or retaliation]." *Id.*; *see also Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012); *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010).  In so doing, the Court must consider: "(1) the plaintiff's *prima facie* case; (2) any

evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)." *Czekalski v. Peters*, 475 F.3d 360, 363-64 (D.C. Cir. 2007) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)). "This boils down to two inquiries: could a reasonable jury infer that the employer's given explanation was pretextual, and, if so, could the jury infer that this pretext shielded discriminatory [or retaliatory] motives?" *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005).

### C. Plaintiff Bell's Claims

Through this case, Bell pursues three separate claims of discrimination and/or retaliation. First, Bell alleges that her non-selection for a GG-14 Personnel Security Specialist position (Vacancy Announcement 07MAY606279) constituted unlawful racial discrimination. Second, she asserts that her failure to be selected for a GG-14 Supervisory Personnel Security Specialist position (Vacancy Announcement 08DEC684728) was racially discriminatory and retaliatory in retribution for her prior discrimination complaints. And third, Bell contends that her failure to receive a discretionary performance award in 2008 was the result of unlawful retaliation. (*See* Dkt. No. 18 ("First Am. Compl.") at ¶¶ 57, 59). The Court considers these claims in turn.

### 1. Race Discrimination Based on Bell's Non-Selection for Vacancy Announcement 07MAY606279

Bell first challenges as discriminatory her non-selection for a GG-14 Personnel Security Specialist position, posted through Vacancy Announcement 07MAY606279. In seeking summary judgment, the Secretary advances a legitimate, nondiscriminatory explanation as to

why Bell was not chosen—that AFCAF simply selected a better-qualified candidate for the position.   In view of this, the Court heeds our Circuit's guidance and proceeds directly to the central question underlying Bell's discrimination claim, asking whether a reasonable jury could conclude that the Secretary's proffered reason for the selection decision is pretextual and that the true motivation was discrimination based on Bell's African-American race.

Hoping that the Court will resolve that question in the affirmative, Bell essentially mounts two lines of attack against the legitimacy of the Secretary's explanation.   She principally argues that a reasonable jury could find this rationale pretextual because, in her view, she was "substantially more qualified" for the position than Ms. Aument, the Caucasian applicant who was ultimately selected.   Bell also suggests that certain "irregularities" in the interview and selection process give rise to an inference of pretext and/or discrimination.   (Dkt. No. 66-1 ("Pls.' Opp'n") at 29-32).   Neither of these arguments is meritorious.

Bell is correct that, in a non-selection case, a jury can infer discrimination based on the candidate's relative qualifications, but only where the plaintiff can establish that she was "significantly better qualified for the job" than the selectee.   *Aka*, 156 F.3d at 1294; *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012) ("[A] disparity in qualifications, standing alone, can support an inference of discrimination only when the qualifications gap is 'great enough to be inherently indicative of discrimination'—that is, when the plaintiff is 'markedly more qualified,' 'substantially more qualified,' or 'significantly better qualified' than the successful candidate.") (internal citation omitted).   On the other side of the coin, the D.C. Circuit has cautioned that, where "a reasonable juror . . . might disagree with the employer's decision, but would find the question close," this usually does not permit an inference of discrimination "on the basis of a comparison of qualifications alone."   *Aka*, 156 F.3d at 1294.   Put another way, "the

qualifications gap must be 'great enough to be inherently indicative of discrimination.'" *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (quoting *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007)). This is because the Court does not sit "as a super-personnel department that reexamines an entity's business decisions," *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (internal quotations omitted), and absent "a decisive showing" of stark superiority in qualifications, the Court "rightfully defer[s] to the business judgment of an employer and ha[s] no cause to infer discrimination," *Hendricks v. Geithner*, 568 F.3d 1008, 1012 (D.C. Cir. 2009). Applying these well-established standards, Bell fails to raise a genuine issue of fact from which a reasonable jury could conclude that she was better qualified for the position than Ms. Aument, let alone significantly better qualified. If anything, the record suggests just the opposite.

In total, four candidates, including Bell, were interviewed for this position. (Dkt. No. 74 ("Joint Facts") at ¶ 27).[1] A three-member interview panel asked each candidate the same six questions and rated the candidates' responses to each of those questions on a scale from one to ten. (*Id.* ¶¶ 30-31). Ultimately, all three interviewers ranked the same candidate, Beverly Aument, the highest of all applicants, with an overall score of 164 (out of 180). (*Id.* ¶ 32). Bell, on the other hand, was ranked as the lowest candidate by all three panelists, with an overall score of 93. (*Id.*).[2] Based on those assessments, and after conducting a further review of all of the candidates' career briefs, the selecting official for the position, Craig Arigo (the Chief of the AFCAF's Personnel Security Support Division), selected Ms. Aument for the position. (*Id.* ¶

---

[1]     Generally speaking, the Court in referring to evidence endeavors to cite to the parties' "Compiled Statement of Material Facts, Responses, and Replies," (Dkt. No. 74), although the Court also cites directly to evidence in the record, where appropriate.

[2]     The difference in Bell's scores as compared to Ms. Aument's is just as stark on an individual level. Ms. Aument received individual scores of 55, 53, and 56, while Bell received individual scores of 30, 30, and 33. (Dkt. No. 59-3, Ex. 13).

33).   According to Mr. Arigo, he also believed Ms. Aument's prior experience serving as the Chief of the Training Branch was particularly important in determining that she would be the best fit for the position.   (*Id.*).   In view of all this—most notably, the independent evaluation of three interviewers selected for their "knowledge of personnel security, leadership skills, and training" within the organization, (*id.* ¶ 29)—the record lends little support to Bell's contention that she was "significantly better qualified" than Ms. Aument.

Nevertheless, Bell stridently argues otherwise.   In so doing, she points to several "comparative factors" between herself and Ms. Aument, which, in Bell's mind, establish that she was "substantially more qualified" for the position.   Specifically, Bell contends that: (a) she had 26 years of "personnel security experience," as compared to Ms. Aument's 10 years; (b) she had 13 years of "supervisory experience," while Ms. Aument had none; (c) she had 9 years of "personnel security training," while Ms. Aument had none; and (d) she received 24 awards, as compared to Ms. Aument's 17 awards.   (Pls.' Opp'n at 10-11).   Bell also suggests that she was more qualified because she previously trained Ms. Aument herself.   (*Id.* at 29).   But Bell's arguments miss the mark.   For one, "[i]t is not for the Court . . . to assess which qualities should 'weigh[ ] more heavily' for an employer" in determining which candidate to select for promotion.   *Pendleton v. Holder*, 697 F. Supp. 2d 12, 18 (D.D.C. 2010) (quoting *Barnette*, 453 F.3d at 517).   Yet this is precisely what Bell asks the Court to do—to discount Mr. Arigo's view in favor of her own beliefs.   The Court declines this invitation.   Moreover, our Circuit has held that "pointing to differences in qualifications that merely indicate a 'close call'"—as Bell essentially strives to do here—does not get her beyond summary judgment.   *Stewart v. Ashcroft*, 352 F.3d 422, 430 (D.C. Cir. 2003).   At bottom, Bell attempts to highlight certain aspects of her experience to the exclusion of others (*i.e.*, her interview performance), asking the Court to look

to the factors she believes should have been important in the selection process. But this argument is grounded in Bell's own "subjective assessments of [her] own credentials," which are "largely irrelevant" for purposes of establishing discriminatory motive. *Washington v. Chao*, 577 F. Supp. 2d 27, 44 (D.D.C. 2008); *Young v. Perry*, 457 F. Supp. 2d 13, 19 (D.D.C. 2006). Instead, "[i]t is the perception of the decisionmaker which is relevant," *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) (internal quotations omitted), and the key issue is whether Mr. Arigo "honestly and reasonably" believed that Ms. Aument was more qualified and a better fit for the position than Bell, *Brady*, 520 F.3d at 496. Bell offers no evidence to undermine the legitimacy of Mr. Arigo's belief in this regard.

Otherwise, Bell claims that a few purported "procedural irregularities" in the interview and selection process enable her to overcome summary judgment. She first claims that the Court should infer pretext because Mr. Arigo did not "vet" his interview questions with AFCAF's Human Resources Department. (Pls.' Opp'n at 32). But Bell fails to cite to any authority—legal or factual—that required Mr. Arigo to vet his interview questions with anyone else, and the use of un-vetted or "subjective questions during an interview . . . does not alone establish a pretext." *Brown v. Small*, 2007 WL 158719, at *7 n.3, 2007 U.S. Dist. LEXIS 3920, at *22 n.3 (D.D.C. Jan. 19, 2007). Moreover, Bell's argument lacks merit in any event because the undisputed evidence establishes that Mr. Arigo actually did attempt to clear his questions with Human Resources, but was told it was not necessary to do so. (Joint Facts at ¶ 30).[3] Bell further complains that Mr. Arigo selected Ms. Aument "without the recommendation of the panel."

---

[3]    Bell purports to dispute this assertion, taking issue with one of the affidavits that the Secretary cites as support. But she ignores that Mr. Arigo's deposition testimony, upon which the Secretary also relies, clearly and unequivocally supports this proposition: "Q: Did anyone in HR assist with drafting these particular questions? A: No, ma'am. I submitted the questions to them, but they told me they no longer reviewed them." (Dkt. No. 73-2, Ex. 9 at 33:16-19). Since Bell proffers no evidence to the contrary, this fact is undisputed.

(Pls.' Opp'n at 32).  As the Court understands her argument, Bell takes issue with the fact that the panel did not make a "formal" or "official" recommendation for a candidate following their interviews.   While this may technically be true, Bell ignores the practical impact of the interviewers' ratings assessments—through which they unanimously ranked Ms. Aument first among the candidates, while ranking Bell last.  (Joint Facts at ¶ 32).  Given that Mr. Arigo relied on those assessments in making his final selection, Bell's argument is really one of semantics and, in the Court's view, does nothing to raise an inference of pretext or discrimination.[4]

Bell also complains that Mr. Arigo improperly justified his selection of Ms. Aument by relying on her "training" experience, given that "training" was not a skill or responsibility explicitly listed in the vacancy announcement.  (Pls.' Opp'n at 11).  However, given the overall supervisory nature of this position, the fact that a candidate's training experience might be afforded some weight during the selection process is a concept that "was fairly encompassed within the announcement."  *Adeyemi*, 525 F.3d at 1228.  Moreover, this Court has previously rejected such a restrictive reading of job announcements because "reasonable employers 'do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions.'"  *Gold v. Gensler*, 840 F. Supp. 2d 58, 68 (D.D.C. 2012) (quoting *Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007)); *see also Browning v. Dep't of the Army*, 436 F.3d 692, 696-97 (6th Cir. 2006) (explaining that "employers are not rigidly bound by the language in a job description," and concluding that an employer's "decision to

---

[4]      Relatedly, Bell contends that one of the panelists, Ms. Spencer-Gallucci, stated that the panel "did not make a selection recommendation," and that she "did not remember [Ms.] Aument."  (Pls.' Opp'n at 11).  In support of those assertions, Bell cites to "Ex. 16, Spencer Gallucci Declaration," but she did not submit an "Exhibit 16" with her opposition papers, and based on the Court's own review, no affidavit from Ms. Spencer-Gallucci appears anywhere on the docket.  But even if Bell had supported these assertions with admissible evidence, the Court fails to discern how these alleged facts would be indicative of discrimination or pretext.

weigh administrative/managerial experience more heavily than the job description suggested [was] simply not sufficient to demonstrate" the falsity of the employer's qualifications-based explanation)).  This argument is therefore unavailing.[5]

Finally, while conspicuously absent from Bell's briefing, it bears noting that two of the three interviewers for the position—Ms. Spencer-Gallucci and Mr. Day—were also African American, (Joint Facts at ¶ 28), and the Court agrees with the Secretary that this strongly negates any inference of racial discrimination against Bell.  *Brown v. Small*, 437 F. Supp. 2d 125, 135 n.10 (D.D.C. 2006) ("The diverse composition of the [interview] panel bolsters the conclusion that they were seeking the candidate who was most qualified for the position and that race and gender were not factors in their decision-making process.") (internal citation omitted); *see also Hammond v. Chao*, 383 F. Supp. 2d 47, 58 n.2 (D.D.C. 2005).   Thus, the Court concludes that no reasonable juror could find that the Secretary's decision to select Ms. Aument for Vacancy Announcement 07MAY606279, rather than Bell, was pretextual or driven by discrimination.

---

[5]      Bell also makes much of the fact that Bradley Himelick—another unsuccessful applicant for this position—was subsequently offered a completely different promotion that, according to Bell, "was not interviewed pursuant to merit competitive procedures."  (Pls.' Opp'n at 11, 31).  The Court is not persuaded.  To begin with, Bell fails to provide any evidentiary support for this assertion.  While she cites to pages 8 and 9 of Mr. Himelick's deposition transcript—which appear at Exhibit 18 to her summary judgment submissions—those pages are not included with Exhibit 18.  (*See* Dkt. No. 69-4).  Furthermore, these alleged facts would not raise an inference of pretext in any event.  In essence, Bell implies that, because Mr. Himelick is Caucasian, the fact that AFCAF selected him for some other position, rather than her, is somehow indicative of racial discrimination or pretext underlying AFCAF's earlier decision with respect to Vacancy Announcement 07MAY606279.  Even assuming that some logical connection might exist between these two circumstances (the Court does not so find), Bell completely overlooks the fact that, based on the interview panel's ratings, Mr. Himelick was ranked <u>second</u> for Vacancy Announcement 07MAY606279, just behind Ms. Aument and well ahead of Bell, with an overall rating of 132 points to Bell's 93 points.  (Dkt. No. 59-3, Ex. 13).  Thus, if anything, the record reflects that Mr. Himelick was selected for this subsequent position because AFCAF believed him to be the most qualified for it.

## 2.   Race Discrimination and Retaliation Based on Bell's Non-Selection for Vacancy Announcement 08DEC684728

Bell also claims that the Secretary discriminated and retaliated against her when she was not selected for a GG-14 Supervisory Personnel Security Specialist position the following year, listed in Vacancy Announcement 08DEC684728.   In response, the Secretary proffers a non-discriminatory and non-retaliatory rationale for this decision—as before, that AFCAF simply chose candidates who were more qualified than Bell.  Given this, the Court again bypasses the question of whether Bell can establish a *prima facie* case and proceeds to the central question of whether a reasonable jury could conclude that the Secretary's explanation is pretextual and that the true motivation was discrimination or retaliation.  In attempting to avoid summary judgment on these claims, Bell marshals familiar arguments.  She insists that she was "substantially more qualified" than at least two of the three selectees, and she also points to purported "irregularities" in the selection process that she claims are indicative of pretext.   (Pls.' Opp'n at 12-13, 32-34). As before, however, neither of these arguments carries the day.

In filling this vacancy, the selecting official, Cristiano Marchiori (then-Chief of Operations of the AFCAF), assembled a three-member panel to interview candidates and to evaluate those candidates using a "Selection Criteria Worksheet" he prepared.  (Joint Facts at ¶ 34-35, 37).   Using this worksheet, the panel evaluated all of the candidates using the same six criteria, each of which was given a maximum total point value: experience (50 points); education (5 points); professional military education (5 points); supervisor's inputs (20 points); awards (5 points); and candidate interview (15 points).  (*Id.* ¶ 37).  Collectively, the maximum score that a candidate could receive was 100 points.  (*Id.*).  Under this process, the panel interviewed and evaluated eleven candidates for the position, including Bell.  (*Id.* ¶ 40-41).  Thereafter, Mr. Marchiori selected the three highest-rated candidates for the position—Lareese Brooks, who

received 70.2 points; Belinda Bugett, who also received 70.2 points; and Marjorie Smith, who received 66.3 points. (*Id.* ¶ 40). Notably, both Ms. Brooks and Mr. Bugett—the two highest-scoring candidates—are also African American. (*Id.*). The interviewers awarded Bell only 52.5 points, placing her ninth out of the eleven candidates who interviewed for the position. (*Id.* ¶ 41). Given all this, the Air Force contends that no reasonable jury could conclude that Bell was "substantially more qualified" for the position than any of the three selected candidates. Based on the undisputed facts in the record, the Court agrees.

In opposition, Bell highlights the same four components of her resume as before—"personnel security experience," "supervisory experience," "personnel security training," and "awards"—and argues that, when stacked against the comparative experience of at least two of the selectees in those categories, a jury could infer discrimination and/or retaliation. (Pls.' Opp'n at 13, 33). This line of argument is unpersuasive for the reasons already stated. In essence, Bell asks the Court to substitute its judgment for that of AFCAF, as to which experiential factors and qualifications were most important in the selection process. The Court will not do so. *Pendleton*, 697 F. Supp. 2d at 18 (quoting *Barnette*, 453 F.3d at 517). Bell also complains that Mr. Marchiori placed undue emphasis on "subjective considerations," such as the interview process, to the exclusion of the candidates' objective qualifications. It is true that courts should "treat explanations that rely heavily on subjective considerations with caution," *Aka*, 156 F.3d at 1298, and our Circuit has characterized "poor interviewing skills" as such a subjective criterion, *Carter v. George Wash. Univ.*, 387 F.3d 872, 879 (D.C. Cir. 2004). At the same time, however, the Court of Appeals has also made clear that an employer's reliance "upon personal interviews is an obviously reasonable method of hiring a professional employee." *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1184 (D.C. Cir. 1996). Such reliance is particularly reasonable

here, given that the candidates' interview performance only accounted for 15% of the total score they received from the panelists.  In fact, even if Bell had received a perfect interview score of 15 points, she still would have been ranked in the bottom half of the candidates vying for the position.  (Dkt. No. 59-3, Ex. 15).[6]  Accordingly, Bell does not come close to establishing the requisite "wide and inexplicable gulf" between her credentials and those of the selectees. *Lathram v. Snow*, 336 F.3d 1085, 1091-92 (D.C. Cir. 2003).

Along with her qualifications-based arguments, Bell also claims that the Court should find pretext because the worksheet created by Mr. Marchiori and relied upon by the interview panel did not "appear to follow any known mathematical formula" and was "not approved by Human Resources."  (Pls.' Opp'n at 13, 33).  However, all of the candidates, including the three selectees, were subjected to the same interview process and ratings formula, which refutes any notion of unique "irregularity" in connection with Bell's application and interview process.  In any event, even if the Court were to believe that Bell "was victimized by . . . poor selection procedures" (the Court does not so find), it cannot "second-guess an employer's personnel decision absent demonstrably discriminatory motive."  *Fischbach*, 86 F.3d at 1183 (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).  Here, Bell fails to adduce evidence suggesting any such motive.  In fact, Bell's claim that the Air Force's decision not to select her for this position was racially discriminatory, in particular, is seriously undermined by the fact that two of the three individuals who were selected for the position were also African American. *Murray*, 406 F.3d at 715 ("[A selectee] within the same protected class cuts strongly against any

---

[6]      Bell was given an interview score of 6.5 out of 15 points.  (Dkt. No. 59-3, Ex. 15). Assuming for the sake of argument that Bell had instead earned the maximum 15 interview points, this would have increased her total score to 61 points, which would have placed her only seventh out of the candidates, rather than ninth.  Either way, Bell does not even approach the scores of the top three applicants who were selected for the position.

inference of discrimination."); *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 314 (D.D.C. 2005) ("[T]he fact that the selectee was a [sic] African-American female, while not dispositive, cuts against plaintiff's claims of discrimination based on sex and race."). Accordingly, the Court concludes that no reasonable jury could find AFCAF's decision not to select Bell for this position was retaliatory or discriminatory on account of Bell's race, and the Court thus grants summary judgment in favor of the Secretary on this claim.

### 3.   Retaliation Based on Bell's Non-Receipt of A Performance Award in 2008

Finally, Bell asserts a retaliation claim based on AFCAF's failure to provide her with a discretionary performance award. At the outset, and given the disjointed nature of the parties' respective briefs, the Court finds it necessary to define clearly the basis for this particular claim. As pled in her First Amended Complaint, Bell alleges that the Air Force unlawfully retaliated against her "when it denied her a performance award <u>in June 2008</u>." (First Am. Compl. at ¶ 46) (emphasis added). In seeking summary judgment, the Air Force—properly construing this claim—maintains that its decision not to issue Bell a performance award <u>in 2008</u> was not retaliatory, but was simply based on the fact that her supervisor did not believe her work went "above and beyond." (Dkt. No. 59 ("Def.'s Mem.") at 12-13). Through her opposition briefing, however, Bell focuses entirely on her failure to receive a performance award <u>in 2007</u>, <u>not in 2008</u>. (Pls.' Opp'n at 14-15, 34-35) (*E.g.*, "A reasonable jury could conclude that Defendant's reasons for not awarding Bell a performance award in 2007 is false, and that the real reason was retaliation for having filed an EEO complaint."). While Bell originally asserted claims based on her denial of a performance award in 2007, Judge Bates previously dismissed those claims on exhaustion grounds before this case was transferred to the undersigned. *See Bell v. Donley*, 724 F. Supp. 2d 1, 9-10 (D.D.C. 2010). At this juncture, therefore, Bell's arguments regarding her

lack of an award <u>in 2007</u> are entirely misplaced, and she otherwise fails to meaningfully respond to the Secretary's arguments with respect to her failure to receive a <u>2008</u> performance award. Based on all this, the Court could find that Bell has conceded these arguments and dismiss this claim as a result.  *See, e.g., Hopkins v. Women's Div., Gen. Bd. of Global Ministrie*s, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)).

But even giving Bell the extreme benefit of the doubt and construing some of her arguments as related to the 2008 timeframe, the Court concludes that Bell still fails to establish a genuine issue of fact suggesting that the Secretary's explanation—that her performance simply did not merit a discretionary award—is pretextual or otherwise indicative of retaliation.  Aside from her own subjective views about the strength of her performance, which are irrelevant for the reasons already stated, Bell essentially identifies two "facts" that she believes show pretext. First, Bell claims that Ms. Mayes, her supervisor at the time, falsely stated that "awards went only to those who came to work in the evenings."  (Pls.' Opp'n at 35).  However, Bell fails to support this assertion with any evidentiary support whatsoever, and the Court refuses to credit her contention as a result. FED. R. CIV. P. 56(c)(1) (explaining that a party must support factual positions by "citing to particular parts of materials in the record").  Otherwise, Bell contends that a reasonable jury could find the Secretary's explanation pretextual because, the same year, a Caucasian manager received an award despite being arrested for larceny charges on a military base.  (Pls.' Opp'n at 35).  As the Secretary rightly points out, however, that employee was arrested <u>after</u> she had already received her 2008 performance award, which means that those circumstances bear no relevance whatsoever to Bell's retaliation claim.  (Dkt. No. 73 ("Def.'s Reply") at 15).  Overall, it is undisputed that the issuance of performance awards is entirely discretionary, and Bell fails to raise any inference from which a reasonable jury could conclude

her failure to receive such an award in 2008 was the product of impermissible retaliation. Accordingly, the Court grants summary judgment in the Secretary's favor on this claim.

### D.  Plaintiff Burton's Claims

For her part, Burton pursues six distinct claims of discrimination and/or retaliation.  First, she alleges that her non-selection for temporary promotion to a GG-13 Signature Authority Position in or around October 2008 was discriminatory on account of her African-American race. Second, Burton contends that the Secretary's failure to promote her to a GG-13 Branch Manager position (Vacancy Announcement 08MAY652556) was retaliatory in response to her prior complaints of discrimination.  Third, she asserts that her receipt of a "Memorandum for Record" in or around February 2009 constituted unlawful retaliation.  Fourth, Burton alleges that the Secretary improperly retaliated against her by failing to select her for a GG-13 Security Specialist Supervisor position (Vacancy Announcement 09JAN690344).  Fifth, she asserts that her non-selection for a GG-13 Personnel Security Specialist position shortly thereafter (Vacancy Announcement 09JAN691763) was retaliatory.  And sixth, Burton asserts that her failure to be chosen for a comparable GG-13 Personnel Security Specialist Position several months later (Vacancy Announcement 09APR0452) was also motivated by improper retaliation.  (First Am. Compl. at ¶¶ 58, 60).  The Court addresses each of these claims in turn.

### 1.  <u>Race Discrimination Based on Burton's Non-Selection for Temporary GG-13 Signature Authority Position</u>

Burton first challenges as discriminatory the Air Force's failure to select her for a temporary promotion to a GG-13 Signature Authority position in or around October 2007. Around that time, AFCAF determined that, in order to meet its production goals, it needed to temporarily promote several GG-12 level employees to the GG-13 level, so that they could

review and sign "Statements of Reasons" ("SORs") to complete the due process adjudication process. (Joint Facts at ¶ 48). To this end, Mr. Arigo directed his team to review the "Joint Personnel Adjudicatory System" ("JPAS") to compare and evaluate the due process experience of the various GG-12 adjudicators in AFCAF. (*Id.* ¶¶ 49, 52). Based principally on this criterion—the number of due process cases employees had adjudicated, as reflected in JPAS— five individuals were selected for temporary promotion to signatory positions at the GG-13 level: James Kerr, Paulette Hite, Tracy Thornton, Barbara Prach, and Amanda McQuain. (*Id.* ¶ 52). Ms. Hite, like Burton, is African American; the other four selectees are Caucasian. (*Id.*).[7] Based on the information in JPAS, the Secretary asserts, most of those individuals had demonstrable "due process" experience, whereas Burton had not completed any due process adjudications at the time of the temporary promotions. (*Id.* ¶ 50).

Notably, Burton testified in her deposition during EEO proceedings that AFCAF's reliance on these particular criteria was entirely legitimate and fair:

> Q:   So if Mr. Marchiori made the decision about who was qualified to assume temporary positions as a GG-13 signature authority, if he considered this data, you would think that's okay?
>
> A:   That would be fine.
>
> Q:   And then you agree that each of those individuals selected had more Due Process actions at the time of the temporary promotion than you did?
>
> A:   Correct. They did.

(Dkt. No. 59-2, Ex. 8).[8] The Court agrees, and based on its own, independent review of the record, the JPAS report cited by the parties establishes that each of the selectees listed above had

---

[7]   It is undisputed that, because these were temporary promotions, management was not required to follow competitive bidding procedures that generally provide applicants an open opportunity to apply for a position. (Joint Facts at ¶¶ 46-47).

[8]   Burton now attempts to disavow this testimony from her EEO deposition, boldly asserting that "unrepresented by counsel at that time, [she] did not understand what she was being asked." (Pls.' Response to Joint Facts at ¶ 51). The Court will not countenance this tactic;

greater due process experience than Burton.  (Dkt. No. 59-3, Ex. 20).[9]  Despite this, Burton now argues that the selecting officials should have also looked to "Suitabilities and Fraudulent enlistments," which she contends also constitute due process experience.  (Pls.' Opp'n at 18).  But other than her own self-serving assertions, Burton presents no evidence to show that those actions are comparable or equivalent to the SORs that drove the selection process for these temporary promotions.  More importantly, and as previously stated, "[i]t is not for the Court . . . to assess which qualities should 'weigh[ ] more heavily.'"  *Pendleton*, 697 F. Supp. 2d at 18 (quoting *Barnette*, 453 F.3d at 517).  The AFCAF focused its assessment on candidates' due process experience as reflected by SORs, and the Court will not second-guess that approach.

Burton also complains that the selection process for these positions was discriminatory because Caucasian employees were "pre-selected" for the promotion.  (Pls.' Opp'n at 16-17, 36-37).  More specifically, Burton points to a meeting held by Deputy Assistant Debbie Kyle during which Burton surmises that "white adjudicators [but] no African American adjudicators" were clandestinely offered the promotion opportunities.  (*Id.* at 16).  But this assertion is belied by the very evidence upon which Burton relies—the declarations of Ms. Prach and Ms. Thornton—which confirm that Ms. Hite, who is African American, was also included in this meeting, and was also offered a temporary promotion.  (*See* Dkt. No. 67-6, Ex. 33, at ECF pp. 3, 5).  Not only do these facts refute Burton's conspiratorial suppositions, but they also cut against a finding of

---

Burton cannot simply ignore sworn deposition testimony that she or her counsel finds problematic.

[9]     The Court observes that Ms. McQuain's numbers, while greater than Burton's, were noticeably lower than the other selected candidates.  However, as explained in the Declaration of Ms. Delventhal, the Branch Manager of the Due Process Branch at the time: "Amanda McQuain had come to us from the Defense Office of Hearings and Appeals and she had been writing statements of reason there.   We contacted her prior supervisors and received rave reviews about her work."  (Dkt. No. 59-3, Ex. 18).  Burton does not contradict this explanation.

racial discrimination in the selection process more generally, since an African-American employee was promoted. *Murray*, 406 F.3d at 715 (citing *Brown*, 199 F.3d at 451).[10]

In addition to the above individuals, Burton claims that "Theresa Lewinski" also received the same type of temporary promotion. (Pls.' Opp'n at 17). Based on its review of the record, the Court assumes that Burton refers to "Theresa Lenkiewicz," whom the Secretary concedes also received a temporary promotion around the same time. Assuming so, Burton conflates the nature of Ms. Lenkiewicz's promotion as compared to the other selectees, given that Ms. Lenkiewicz was elevated to the role of Training Branch Chief, not a due process position.[11] According to the Secretary, Ms. Lenkiewicz was selected for this position because she was already effectively performing the functions of the Training Branch Chief and teaching the branch's course material. (Joint Facts at ¶ 53). Burton does not meaningfully dispute this fact, nor does she contend the she was more qualified to lead the Training Branch than Ms. Lenkiewicz. As a result, Ms. Lenkiewicz's promotion does not raise an inference of pretext or discrimination on account of Burton's race.

Therefore, the Court thus grants summary judgment in favor of the Secretary as to Burton's race discrimination claim based on these temporary promotions.[12]

---

[10]  Burton also contends that her supervisors in AFCAF "moved" several Caucasian adjudicators into the Due Process branch almost immediately before the promotions to justify their selection, but the Court disregards those assertions because Burton fails to support her statements with any evidence. *See* FED. R. CIV. P. 56(c)(1).

[11]  This personnel change was necessary because the prior Training Branch Chief, Beverly Aument, had recently been promoted herself, as discussed in connection with Bell's claims.

[12]  Finally, while neither Burton nor Bell expressly harness this argument in connection with any of their specific claims, the Court notes that their opposition brief abstractly argues that AFCAF imposes a "glass ceiling" on African-American employees and has a "history of discriminating against African American adjudicators." (Pls.' Opp'n at 2). Aside from conclusory arguments and vague allegations, however, Plaintiffs present little in the way of evidence to support such a claim. And based on the undisputed record before the Court, their concerns sound more in hyperbole than in fact. In reality, the facts actually establish that the Air

### 2.   **Retaliation Based on Burton's Non-Selection for 08MAY652556 Position**

In or around May 2008, AFCAF posted Vacancy Announcement 08MAY652556, through which it sought to make permanent many of the temporary signatory positions discussed above. (Dkt. No. 59-4, Ex. 23). Burton applied under this announcement but was not selected, and she now contends that her non-selection was based on unlawful retaliation.

Mr. Marchiori was the selecting official for the seven positions being filled under this announcement, which included several "Signature Authority" positions in the Due Process Branch, a Due Process Branch Team Chief, and a Personnel Security Specialist Team Lead. (Joint Facts at ¶¶ 54-55). As might be expected, for the positions in the Due Process Branch, the AFCAF was seeking applicants with due process experience. (*Id.* ¶ 55). Mr. Marchiori selected four panel members to interview the eligible candidates and to rate their responses using the same type of "selection criteria worksheet" previously summarized. (*Id.* ¶¶ 57-58). Each candidate could receive a maximum of 100 points, derived primarily from supervisors' input, and also taking into account education, professional military education, awards, and interview

_____

Force—and AFCAF in particular—has a "strong track record in equal opportunity employment." *Czekalski*, 475 F.3d at 363-64 (quoting *Aka*, 156 F.3d at 1289). Approximately fifty-five percent of all employees within the AFCAF are African American. (Joint Facts at ¶ 16). Furthermore, seventeen out of twenty-two employees (more than 77%) in Bell's branch during the relative period were African American, (*id.* ¶ 45), and Burton estimated that, at one point, approximately sixty percent of the employees in her branch were African American, (*id.* ¶ 21). The facts also establish that African-American employees in Plaintiffs' branches were regularly selected for promotion, in many cases, through the same Vacancy Announcements that form the basis for this lawsuit. For example, AFCAF filled two of the three positions posted through Vacancy Announcement 08DEC684728 with African-American employees. (*Id.* ¶ 40). In addition, for the temporary GG-13 signatory position about which Burton complains, at least one African-American adjudicator was selected for that position, and two African-American employees were later promoted when those positions were made permanent. (*Id.* ¶¶ 52, 59). Finally, many of the interviewing panels and selecting officials for the positions at issue in this lawsuit were comprised at least partially—and, in some cases, entirely—of African-American supervisors and managers, which completely belies the notion that some sort of "glass ceiling" precluded Plaintiffs from advancing within AFCAF. (*Id.* ¶¶ 28, 38, 66, 71, 74). If anything, these facts tilt in the Secretary's favor and refute any notion of discriminatory animus in connection with Plaintiffs' claims in this case.

performance.  (*Id.* ¶ 58).  Twenty employees, including Burton, were considered for the seven available positions.  (*Id.* ¶ 59).  Ultimately, Mr. Marchiori selected the seven candidates with the highest overall scores; Burton was ranked eighth out of twenty, and she was therefore not selected for any of the positions.  (*Id.*).  In seeking summary judgment on this claim, the Secretary thus maintains that Burton was not selected because of legitimate, non-retaliatory reasons—AFCAF chose better-qualified candidates.  As a result, the Court proceeds to the "central" question and asks whether a reasonable jury could find that explanation pretextual or a mere disguise for unlawful retaliation.[13]

In the face of this explanation, Burton argues (although less stridently than in connection with her other claims of non-selection) that a jury could infer pretext because she was more qualified than some of the selectees.  (Pls.' Opp'n at 19-21, 38-39).  On the present record, however, Burton simply fails to establish that she was "significantly better qualified," as she must.  *Aka*, 156 F.3d at 1294.  In fact, she testified that she simply believed she was "just as experienced" and qualified as the candidates who were selected:

> Q:   Do you think you were the most qualified for the May, 2008 job?
> A:   I was qualified.
>
> *     *     *     *
>
> Q:   So are you saying that the approximately ten cases that you claim you adjudicated in the three months you had been there before you applied made you more experienced than all of the selectees?
> A:   Just as experienced.

(Dkt. No. 59-2, Ex. 3, ECF pp. 33-34).  Therefore, at most, "the qualifications differential

---

[13]   The Court notes that neither party clearly identifies the protected activity that Burton claims served as the impetus for the Air Force's alleged retaliation in failing to select her for a temporary signatory promotion.  Drawing from other portions of Plaintiffs' opposition, the Court presumes that Burton relies upon her complaints of discrimination to Colonel Hickman during an October 2007 meeting.  (*See* Pls.' Opp'n at 16).  But the Court need not dwell on the issue since the Secretary does not challenge this component of Burton's claim in any event.

[Burton] highlights merely indicate[s] a 'close call' and fails to move her case beyond summary judgment." *Barnette*, 453 F.3d at 518 (quoting *Stewart*, 352 F.3d at 430) (internal quotation marks omitted) (second alteration in original).

Otherwise, Burton contends that the interview process was "manipulated" to prevent her from securing the promotion, (Pls.' Opp'n at 19-21, 38-39), but her arguments are unavailing and, in many cases, lack any evidentiary support in the first place. First, she complains that the interviewing panel failed to take her Associate's Degree into account in evaluating her education on the worksheet; had the panelists done so, Burton claims she would have received another two points. For his part, the Secretary does not now dispute that Burton holds an Associate's Degree, nor does he dispute that Burton's degree would have earned her an additional two points in the evaluation process. Nevertheless, the Secretary maintains that these facts fail to raise an inference of pretext. According to the Secretary, to the extent that this information was not accurately accounted for in the review process, the blame lies with Burton because her degree was not listed in her career brief and it was Burton's responsibility to ensure that her career brief was current and up to date. (Def.'s Mem. at 34). In fact, the record establishes that Burton was sent an email message on June 30, 2008, asking her to ensure that her "career brief data," including her college education level, was accurate, but Burton proffered no evidence that she respond to this message or otherwise updated her career brief. (Dkt. No. 67-4, Ex. 31). As a result, the Secretary rightly asserts that these circumstances hardly suggest an intentional, retaliatory motive on the part of the selecting officials. Moreover, even if Burton had received an additional two points in light of her degree, the Secretary points out that she would have only earned 68 total points—a number that is still lower than the 68.5 points received by the seventh-

place candidate, Rodney Hunt.[14]   The Court agrees that these facts fail to raise an inference of pretext or retaliatory animus.

In addition, Burton claims, in conclusory fashion, that the interview panel "incorrectly calculated [her] raw interview score as 132 instead of 136." (Pls.' Opp'n at 19).   But the only evidence that Burton cites for this assertion is the "Selection Criteria Worksheet" at Exhibit 42, (Dkt. No. 67-15), and the Court finds no support for that allegation therein.   Similarly, Burton also contends—again, citing only to Exhibit 42—that "the Agency erased and changed the numbers on Burton's score sheet eight (8) times, then . . . incorrectly added the final resulting score." (Pls.' Opp'n at 20).   The Selection Criteria Worksheet establishes no such thing.

That being said, the Secretary did submit with his reply brief the raw interview score sheets prepared by two of the panelists, Beverly Aument and Ron Zale, and he concedes that Burton should have received a total raw interview score of 134 instead of 132 (but not 136, as Burton summarily argues).   (Def.'s Reply at 8-9 n.6 (citing Dkt. No. 73-2 at Exs. 42-43)).   Even so, there appears to be no dispute that this slight increase in her raw score—from 132 to 134— would not have impacted Burton's final ranking.[15]   The Secretary also concedes that some of Burton's interview scores were changed by the panelists at the time of their evaluations, but he points out that the same is true with respect to several other candidates' scores, which undercuts any notion of intentional retaliatory animus against Burton specifically.   (Id.).   Perhaps more to the point, however, is that the critical issue for the Court to consider is whether the interviewing

---

[14]     Burton also alleged that Hunt's interview score was erroneously increased by five points (Pls.' Opp'n at 20), but the exhibit she proffered provides no support for this assertion.

[15]     Based on the conversion chart, a raw interview score of 131-135 translates to a converted interview score of 2, which is what Burton originally received.   (Dkt. No. 59-4, Ex. 27).   Under AFCAF's rubric, Burton must have earned at least 136 points to have merited a converted score of 3, which might have increased her overall ranking.   (Id.).   But Burton presents no evidence that the interview panel mistakenly, much less intentionally, deprived her of a higher ranking along these lines.

panel and, in turn, Mr. Marchiori, "honestly and reasonably" believed that the selectees were more qualified than Burton for the position. *Brady*, 520 F.3d at 496. And even if the panelists may have made some minor arithmetic errors in tabulating their scores, this fact, without more, does not impugn the legitimacy of their beliefs in this regard. On balance, Burton's arguments are simply too speculative for a reasonable jury to conclude that the Secretary's explanation is pretextual or otherwise disguising an improper retaliatory motive. Accordingly, the Court will grant summary judgment in favor of the Secretary as to this claim.

### 3.   Retaliation Based on Burton's Receipt of a Memorandum of Record in 2009

Burton next contends that her supervisor, Belinda Bugett, unlawfully retaliated against Burton by issuing her a "Memorandum for Record" ("MFR") on February 26, 2009, due to a delinquent file being handled by Burton. In seeking dismissal of this claim, the Secretary first argues that Burton did not timely exhaust her administrative remedies because she failed to contact an EEO counselor within 45 days. *See* 29 C.F.R. § 1614.105(a)(1). As pled in the First Amended Complaint, it is true that Burton alleges that she first initiated contact with the EEOC Office on April 24, 2009—more than 57 days after receiving the MFR she now challenges. (First Am. Compl. at ¶ 11). However, Burton now directs the Court to an email message dated April 2, 2009—within the 45-day exhaustion window for her claim—wherein she notified an EEO Specialist that she wanted to register her receipt of the MFR "as retaliation for [her] EEO complaint." (Dkt. No. 67-14, Ex. 41). That same message confirms that, just a few days later, the EEO Specialist responded to Burton and confirmed that her "contact date in EEO Net is 2 Apr 09." (*Id.*). Inexplicably, the Secretary does not even address this fact in his reply brief, instead stubbornly continuing to assert, without any citation or support, that Burton did not contact the EEO until April 24, 2009. This head-in-the-sand approach is unpersuasive, to say the

least, and the Court therefore rejects the Secretary's argument that Burton failed to timely exhaust her administrative remedies and denies his Motion to Dismiss in Part on these grounds.

However, the Secretary also seeks summary judgment on this claim on the merits, arguing that Burton cannot establish that Ms. Bugett's issuance of the MFR was retaliatory. He maintains that Burton received this MFR for a legitimate, non-retaliatory reason—because a file to which Burton was assigned was discovered as being more than six months overdue. Burton does not dispute that the file was severely overdue, nor does she dispute the fact that appeal cases, such as this one, are among the most time-sensitive handled in this office. (Joint Facts at ¶ 63). Nevertheless, Burton contends that a jury could find Ms. Bugett's issuance of the MFR in February 2009 raised an inference of pretext or retaliatory motive because "[t]he passage of a mere five days between the protected activity (testifying concerning discrimination) and the discipline clearly implies a causal connection to [her] protected activity." (Pls.' Opp'n at 40). However, our Circuit has explained that "positive evidence beyond mere proximity is required to defeat the presumption that [an employer's] explanations are genuine." *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *Hutchinson v. Holder*, 815 F. Supp. 2d 303, 318-19 (D.D.C. 2011). And other than the timing of the MFR, Burton presents no other evidence to suggest that Ms. Bugett's explanation is pretextual or an effort to otherwise mask unlawful retaliation.[16] Because no reasonable jury could conclude that Burton's receipt of the MFR was retaliatory, the

---

[16]    Burton also points out the "coincidence" that Ms. Bugett did not discover this overdue file earlier, despite the fact that she conducted weekly reviews for cases more than 30 days overdue, and the fact that this particular case file was 23 weeks overdue. (Pls.' Opp'n at 21, 40). But this is really just a twist on Burton's timing and proximity argument, and, as explained above, she must come forward with some "positive evidence beyond mere proximity" to survive summary judgment. *Woodruff*, 482 F.3d at 530.

Court therefore grants summary judgment on this claim in the Secretary's favor.[17]

### 4.   <u>Retaliation Based on Burton's Non-Selection for 09JAN690344 Position</u>

Burton also contends that she was retaliated against when she was not selected for a GG-13 Security Specialist Supervisor position, under Vacancy Announcement 09JAN690344. Bradley Himelick, then-Chief of Operations for the AFCAF, was the selecting official for this position. (Joint Facts at ¶ 65). For the first part of the selection process, Mr. Himelick organized an interview panel of senior supervisors and managers, who asked all the candidates the same series of questions designed to evaluate their "leadership qualities, managerial qualities, supervision qualities, the[ir] ability to communicate, and interpersonal skills." (*Id.* ¶ 66). Fourteen individuals were interviewed for the position, and after the panel completed the interviews, candidates scoring in the top 50% progressed to the next round of the process, where they were evaluated through a "supervisor questionnaire" and an "applicant experience assessment." Based on her interview, Burton received a total score of 39 (out of 90), which placed her ninth out of the fourteen candidates. (Dkt. No. 59-4, Exs. 33, 34). Because she did not rank in the top half of the applicants, Burton was not considered for the position beyond the first round. Ultimately, based on the unanimous recommendations of the panel, Mr. Himelick selected Carla Robinson, Rodney Hunt, and Jennifer Lichliter for the position. Ms. Robinson and Mr. Hunt earned interview scores of 90, and Ms. Lichliter received a score of 58. (Joint Facts at ¶ 68). In view of these facts, the Secretary maintains that Burton was not chosen for a legitimate, non-retaliatory reason—AFCAF chose more qualified candidates than Burton.

---

[17]     The Secretary also argues that Burton's retaliation arguments are undermined by the fact that Ms. Bugett issued an MFR for similar conduct—"lack of productivity"—to a Caucasian employee. (Def.'s Mem. at 35). But this argument conflates the salient issues surrounding Burton's various claims. She challenges the MFR as <u>retaliatory</u>, not as racially discriminatory (as with her initial non-selection claim). As to this claim, the race of other employees who received similar discipline proves nothing.

Burton attacks this justification as pretextual, primarily arguing that she was more qualified than the ultimate selectees, and also that procedural "irregularities" in the interview process raise questions of pretext and retaliatory motive. (Pls.' Opp'n at 41-42). As to the first of these arguments, Burton again fails to raise a factual issue suggesting that she was "significantly better qualified" than Ms. Robinson, Mr. Hunt, and/or Ms. Lichliter. *Aka*, 156 F.3d at 1294. Instead, she simply argues, in conclusory fashion, that she "was the only candidate with all the required experience—both due process and case review experience." (Pls.' Opp'n at 22). This sort of self-serving assertion hardly rises to the level of "a decisive showing" of superiority in her qualifications as compared to those of the selectees. *Hendricks*, 568 F.3d at 1012. Moreover, given the supervisory nature of this position, Mr. Himelick's focus was apparently centered on the candidates' leadership experience abilities, perhaps more heavily than the candidates' hands-on experience in adjudicating due process cases. (Joint Facts at ¶ 66). And despite Burton's protestations to the contrary, the Court declines her invitation to second-guess AFCAF's determinations about which factors it ought to have "weigh[ed] more heavily" in its selection process. *Pendleton*, 697 F. Supp. 2d at 18.

With respect to the supposed "irregularities" that Burton identifies, she contends that AFCAF "used several techniques to eliminate [her] halfway through the process," including the "supervisor questionnaire," the "applicant experience assessment," and "un-vetted" interview questions. (Pls.' Opp'n at 22-23). These arguments are without merit. First, because Burton did not receive an interview score in the top 50% of the eligible candidates, she was never evaluated through a "supervisory questionnaire" or an "applicant experience assessment" for this particular vacancy. In fact, the "Interview Ratings Sheets" to which she cites (appended as Exhibit 50 to her opposition brief) pertain to Vacancy Announcement 09JAN691763, and not this position.

(Dkt. No. 67-23).   As for Burton's complaint about "un-vetted" interview questions, this argument overlooks the fact that all of the candidates were subjected to the same series of questions, negating any inference of individualized, intentional retaliation against Burton.   In addition, the Court rejects the notion Mr. Himelick's "un-vetted" interview questions can give rise to an inference of pretext in any event, for the reasons already stated.

Accordingly, the Court will grant summary judgment in favor of the Secretary and will dismiss Burton's claim surrounding Vacancy Announcement 09JAN690344.

### 5.   <u>Retaliation Based on Burton's Non-Selection for 09JAN691763 Position</u>

Burton next challenges as retaliatory her non-selection for a GG-13 Personnel Security Specialist position, posted through Vacancy Announcement 09JAN691763.   Mr. Himelick also served as the selecting official for this position, and he followed a similar process to that used in connection with Vacancy Announcement 09JAN690344.   Because the position was non-supervisory and more technical in nature, however, Mr. Himelick flipped the steps of the process around.   Applicants were first evaluated through the "supervisor questionnaire" and "applicant experience assessment," and then the top 50% of those applicants were considered for the position following an interview.   (Joint Facts at ¶ 70).   Nevertheless, Mr. Himelick testified that he provided all of the candidates—regardless of their ratings after the first phase—with the opportunity to interview with the panel, so that they could gain interview experience for future opportunities.   (*Id.*).   Under this format, the three-member interview panel—comprised of Belinda Bugett, Rodney Hunt, and Paulette Hite—unanimously recommended Justin Oswald as the selectee for the position.   (*Id.* ¶ 71).   The record establishes that Mr. Oswald received an interview score of 65 (tied for first among the 24 interviewed candidates), but neither party provides any clear evidence of his scores on the "supervisor questionnaire" or "applicant

experience assessment" from the first phase of the selection process.  (Dkt. No. 59-4, Ex. 38).

Conversely, Burton's "supervisor questionnaire" and "applicant experience assessment" scores,

according to the Secretary, did not place her in the top half of applicants, and she was not

selected for the position as a result.

Burton attacks the Secretary's explanation for her non-selection—that Mr. Oswald was a

better-qualified candidate—as pretextual.   Unsurprisingly, she first argues that she was

"substantially more qualified" than Mr. Oswald, but the Court begins with Burton's other

arguments surrounding several claimed "irregularities" in the selection process.  To start with,

Burton argues that AFCAF failed to adhere to the mandatory "time-in-grade" requirement for the

vacancy, as required by federal regulations.  *See* 5 C.F.R. § 300.604(a) ("Candidates for

advancement to a position at GS-12 and above must have completed a minimum of 52 weeks in

positions no more than one grade lower (or equivalent) than the position to be filled.").  The

posting for the position expressly confirmed this requirement and stated that eligible candidates

"[m]ust have one year of specialized experience equivalent to the GS-12 level to qualify for

appointment at the GS-13 grade level."  (Dkt. No. 59-4, Ex. 36).  Because Mr. Oswald was hired

by AFCAF in June 2008, Burton insists that, at the time of his promotion in April 2009, he did

not satisfy the one-year requirement called for by the regulation and the vacancy announcement.

(Pls.' Opp'n at 24, 43).  Inexplicably, the Secretary completely failed to respond to this argument

in his reply brief, completely ignoring the issue altogether.   While "small deviations" from

selection procedures are generally insufficient to establish pretext, *Bailey v. Wash. Metro Area

Transit Auth.*, 810 F. Supp. 2d 295, 307 (D.D.C. 2011) (citing *Porter v. Shah*, 606 F.3d 809, 816

(D.C. Cir. 2010)), Mr. Oswald's failure to meet the time-in-grade requirement for this

announcement is more than a mere "deviation."  To the contrary, the time-in-grade requirement

bears on Mr. Oswald's overall eligibility for the promotion in the first place. *See, e.g.*, *Hunter v. Rice*, 480 F. Supp. 2d 125, 135 (D.D.C. 2007) (finding that applicant plaintiff's failure to meet "time-in-grade" requirement at GS-13 level rendered him ineligible for position at higher GS-14 level); *Booth v. District of Columbia*, 701 F. Supp. 2d 73, 83 (D.D.C. 2010) (similar).   While there may be some legitimate, good faith reason for this anomaly, the Secretary failed to provide an explanation through his summary judgment briefing.

Burton also points out that, less than two weeks before Ms. Bugett completed Burton's "supervisor questionnaire" and "applicant experience assessment" for the position (on April 13, 2009), Burton had lodged an EEO complaint against Ms. Bugett related to the MFR she received. Since Ms. Bugett evaluated Burton poorly (thereby precluding Burton from further consideration for the position), and since her evaluation came right on the heels of that EEO complaint, Burton insists that a reasonable jury could find Ms. Bugett was out to "sabotage" Burton in retribution for her complaint.   In response, the Secretary attempts to discredit Burton's timing theory, continuing to represent that Burton did not file her complaint against Ms. Bugett until April 24, which was <u>after</u> Ms. Bugett completed her evaluations.[18]   (Def.'s Reply at 16 n.8).   But the Court rejects this argument for the reasons already stated.   The record establishes that Burton lodged her EEO complaint against Ms. Bugett on April 2nd—well before Ms. Bugett completed her evaluations for this vacancy.   (Dkt. No. 67-14, Ex. 41).   From there, Burton highlights several areas of Ms. Bugett's evaluations as suspicious, such as the fact that she failed to award Burton

---

[18]   The Court notes that Burton advanced a similar argument with respect to Ms. Bugett's involvement in the selection process for Vacancy Announcement 09JAN690344.   (*See* Pls.' Opp'n at 22-23, 41-42).   But, with respect to that position, the Secretary explains—and Burton does not dispute—that the interview panels were conducted on March 25-27, 2009, several days <u>before</u> Burton lodged her complaint against Ms. Bugett.   (Def.'s Mem. at 36 (citing Dkt. No. 59-4, Ex. 35)).   As a result, Burton's proximity argument finds no traction in connection with her claim for this earlier non-selection.

any points for two categories of experience, while Burton's second-line supervisor, Brenda Sanders, also completed an assessment for Burton and rated her with a "4"—the highest possible score—for those exact same categories. (Dkt. No. 67-23, Ex. 50, at ECF pp. 17, 20, 27, 30). In Burton's view, the sharp differences between Ms. Bugett's scores versus Ms. Sanders' raise an inference of pretext, and, while there may be some cogent explanation for the disparity, at least at this juncture, the Secretary did not present one.[19]  When combined with the fact that the candidate chosen in lieu of Burton apparently did not satisfy the time-in-grade requirements necessary to qualify for the promotion in the first place, the Court cannot say that a reasonable jury would find these circumstances completely free of pretext or unlawful retaliation.

All that said, the Court pauses to point out that the Secretary did present some credible evidence to establish that the interview panel and Mr. Himelick legitimately believed Mr. Oswald to be the best-qualified candidate for the position, rather than Burton.  For example, the record reflects that, during the second phase of the process, Burton received an interview score of 48, behind at least eight other candidates and well behind Mr. Oswald's first-place score of 65.  (Dkt. No. 59-4, Ex. 38).  Thus, even if Burton had remained in the running after the initial phase of the selection process—assuming she received higher scores on the "supervisor

---

[19]     The Court feels the need to point out that the Secretary's explanation of the selection process for this particular vacancy was far less transparent and cohesive than the processes used for most of the other positions that are the subject of Plaintiffs' claims.  While the Secretary submitted a clear and understandable copy of the interview scores for each of the candidates, the same cannot be said for the scoring and evaluation process related to the first phase of the interview process—the "supervisor questionnaire" and the "applicant experience assessment"— which was reputedly the portion of the selection process that knocked Burton out of the running. At best, Mr. Himelick authenticated "a photograph of a chalkboard which contains the tabulated scores of the candidates following the selection process" for this announcement. (Dkt. No. 59-4, Ex. 37).  But beyond that brief description, the Secretary otherwise fails to provide any explanation for how those scores were reached and simply leaves the Court to guess.  The Court cannot do so, particularly given its obligation, at this stage in the proceedings, to view the evidence in the light most favorable to Burton.

questionnaire" and "applicant experience assessment"—it may well be that her interview score would have dashed her chances at the promotion in any event.  Similarly, the evidence suggests that the individual interview score that Burton received from Ms. Bugett was identical to the scores she received from the other panelists, Mr. Hunt and Ms. Hite; this evidence might well undermine Burton's theory of retaliatory "sabotage" on the part of Ms. Bugett.  (*See id.*).  However, this evidence must be counterbalanced against the evidence brought forth by Burton, and given the disputes of material fact that presently surround the validity of the Secretary's explanation, summary judgment is not appropriate on this claim.  At the end of the day, Burton's evidence on this claim appears to be weak and "[a] jury may resolve . . . these issues in favor of [the defendant], but without improperly resolving disputed issues of fact, [the court] cannot." *Arrington v. United States*, 473 F.3d 329, 337 (D.C. Cir. 2006) (quoting *Greene v. Dalton*, 164 F.3d 671, 674 (D.C. Cir. 1999)).

### 6.  <u>Retaliation Based on Non-Selection for 09APR704512 Position</u>

Finally, Burton argues that the Air Force's decision not to select her for a comparable GG-13 Personnel Security Specialist Position, through Vacancy Announcement 09APR704512, was unlawfully retaliatory.  In evaluating the central question underlying this claim, the Court concludes that Burton fails to adduce evidence from which a reasonable jury could conclude that the Secretary's representation that AFCAF chose a better-qualified candidate is pretextual or indicative of a retaliatory motive against Burton.

To select the candidate for this position, Gary Coleman, Chief of the Personnel Security Support Division, convened an interview panel that asked all of the applicants the same ten questions.  (Joint Facts at ¶ 77).   In addition, the panel evaluated and scored five other criteria for each applicant, including experience, education, professional military education, supervisor's

input, and award recognition during the previous three years. (*Id.*). Based on this process, Mr. Coleman selected the candidate who received the highest ratings from the selecting panel— Charles Clemmer, who earned a total of 88.84 points (out of 100). (*Id.* ¶ 75). Burton, by contrast, received only 46 points, and finished fifth out of the six candidates who competed for the position. (*Id.*).

In a familiar refrain, Burton assails this explanation and insists that she was "substantially more qualified" for the position than Mr. Clemmer. And while long on rhetoric and generalities, Burton's arguments fall far short on specifics. She simply argues, in summary fashion, that Mr. Clemmer did not have as much due process experience as she had, given that he was previously assigned to the Training Branch and not the Due Process Branch, like Burton. (Pls.' Opp'n at 25-26, 45-46). This supposed "qualifications gap" is plainly not "great enough to be inherently indicative" of retaliation. *Adeyemi*, 525 F.3d at 1227 (internal quotation omitted). Moreover, the Court of Appeals has cautioned against "'assess[ing] the significance of small differences' in substantive experience (such as the subject matter of candidates' work)," as Burton asks the Court to do here. *Barnette*, 453 F.3d at 517 (quoting *Stewart*, 352 F.3d at 430). Otherwise, Burton contends that the interview questions were not appropriately geared toward the applicable qualifications for the position. (Pls.' Opp'n at 45-46). But Burton's subjective views on the subject are immaterial, and the Court will not venture into the issues of "which qualities should 'weigh[] more heavily' for an employer," either in the interview process or the selection procedures more generally, for the reasons already stated. *Pendleton*, 697 F. Supp. 2d at 18 (quoting *Barnette*, 453 F.3d at 517).

Finally, the Secretary rightly emphasizes that that Mr. Coleman was completely unaware of Burton's prior EEO activity at the time of his decision to select Mr. Clemmer for the position

instead of her—indeed, Burton expressly concedes as much.  (Joint Facts at ¶ 78).  The D.C.

Circuit has held that "supervisors could not have retaliated against [a plaintiff] unless they had

knowledge of [her] protected activity."  *Jones*, 557 F.3d at 679; *see also Pollard v. Quest

Diagnostics*, 610 F. Supp. 2d 1, 31 (D.D.C. 2009); *Henderson v. Rice*, 407 F. Supp. 2d 47, 52

(D.D.C. 2005).  Insofar as there is no dispute that Mr. Coleman was the selecting official for this

position, and no dispute that he was entirely unaware of Burton's underlying protected activity,

her retaliation claim with respect to this position falls short on these grounds as well.[20]


## CONCLUSION

For the foregoing reasons, the Court concludes that the Secretary's Motion to Dismiss in

Part will be **DENIED**, and that the Secretary's Motion for Summary Judgment will be

**GRANTED IN PART** and **DENIED IN PART**.  An appropriate Order accompanies this

Memorandum Opinion.

Date:  March 8, 2013

_____
ROBERT L. WILKINS
United States District Judge

---

[20]     The Court is mindful that a plaintiff need not always come forward with <u>direct</u> evidence that her supervisor (or the otherwise relevant decision-maker) was aware of her underlying protected activity to survive summary judgment on a retaliation claim.  Rather, as our Circuit explained in *Jones*, a "plaintiff need only offer <u>circumstantial evidence</u> that could reasonably support an inference" that her supervisor was aware of protected activity.  *Jones*, 557 F.3d at 679 (emphasis added).  The Court of Appeals explained that a jury might infer such knowledge, among other ways, where the employer knew about the protected activity, even if the individual supervisor or decision-maker did not.  *Id.*  But these principles find no application in this case, where Burton expressly concedes that Mr. Coleman, as the sole decision-maker behind the allegedly adverse action, was unaware of the underlying protected activity at the time of the challenged decision.  (Joint Facts at ¶ 78).